UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DANIEL J. LEMASTER,

      Plaintiff,

      v.

ANCHOR HOCKING, LLC, *et al.*,

      Defendants.

Case No. 2:11-CV-00549
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Norah M. King

## OPINION AND ORDER

Plaintiff Daniel J. Lemaster ("Lemaster") brings this action against his former employer, Anchor Hocking, LLC ("Anchor"),[1] and the labor union he formerly belonged to, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, Local Union #25 ("USW" or "Union"), alleging violations of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, et seq., and the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, et seq.  Lemaster also brings multiple state-law claims.  This matter is before the Court for consideration of Anchor's Motion for Summary Judgment (ECF No. 38) and USW's Motion for Summary Judgment (ECF No. 31).  For the reasons that follow, Defendants' Motions are **GRANTED**.

---

[1] Lemaster also named Anchor Hocking CG Operating Company, LLC; Anchor Hocking Consumer Glass Corporation; and Anchor Hocking Operating Company, LLC as Defendants in his Complaint.  Within its Answer, Anchor Hocking, LLC, admitted that it was Lemaster's employer and stated that the other named Anchor entities were not associated with Plaintiff's employment.  At this stage in proceedings, the parties do not appear to dispute that Anchor Hocking, LLC, is the proper employer Defendant.

## I. BACKGROUND

A. **Relevant Facts**

1. **Lemaster's Employment with Anchor**

The action stems from Lemaster's termination from employment with Anchor based on allegations that Lemaster threatened and intimidated employees. Anchor, a Delaware limited liability company with its principle place of business in Ohio, operates a glass manufacturing plant in Lancaster, Ohio. USW represents Anchor's production and manufacturing employees, including job change technicians, for the Lancaster plant.

Lemaster started working for Anchor in 1991. (Pl. Dep. 12–13, ECF No. 33.) In 2006, Lemaster began working as a technician for Anchor's "Job Change" Department.[2] (*Id.* at 17.) The duty of Anchor's job change technicians is to change and switch machinery to allow for production of a different type of product. (*Id.* at 18–19.) Job change technicians typically work in crews of four to five people. (White Dep. 9–10, ECF No. 35.) As Lemaster described, job change work is extremely hot and dirty, and can be dangerous. (Pl. Dep. 19.) The machinery can weigh between 25 to 500 pounds. (*Id.*) Frank White ("White"), Lemaster's former job change co-worker and Grievance Committee Person,[3] stated that—given the heat, close proximity, and timing of job change work—it was not uncommon for there to be confrontations involving job change employees. (White Dep. 24–25; *see also* Tigner Dep. 13, ECF No. 42-1.)

Lemaster's supervisor within the Job Change Department was Chris Norris ("Norris").

---

[2] Lemaster began as an apprentice in the Job Change Department, but became a journeyman in 2009. (Pl. Dep. 17–18.)

[3] A Grievance Committee Person is the union representative responsible for writing up grievances. (Pl. Dep. 48.)

2

(Pl. Dep. 20.) Job change crews also have designated "lead persons." (*See* CBA Art. 5 Sec. 2, ECF No. 37-1.[4]) Anchor's management has the right to select lead persons. (*Id.*) Lead persons have the right to give instructions that were to be "treated as direct instructions of supervision" and received a higher pay rate. (*Id.*) Lead persons did not "have the authority to hire, terminate, lay off, or discipline employees . . . ." (*Id.*) Lemaster testified that he sometimes performed the work of lead person for job change crews. (Pl. Dep. 21.) Other job change crew lead persons included Paul Augusta, Steve Harley, Terry Tignor ("Tignor"), and Mike Sims ("Sims"). (*Id.* at 22.)

Prior to the events of this case, Lemaster's employment records contained two instances of discipline and/or reprimand. In 1995, Lemaster received a seven-day suspension for fighting with a co-worker. (Lemaster Dep. Ex. A, ECF No. 33-1.) In 2004, Lemaster received a union letter, stemming from a co-worker's allegations of harassment, advising him that harassment would not be tolerated and that further incidents would result in discipline. (Lemaster Dep. Ex. B, ECF No. 33-1.) Lisa Carr ("Carr"), Anchor's Human Resource Manager, testified that Sims—who was frequently Lemaster's lead person—had twelve disciplinary occurrences within his employment record, two of which reflected a physical altercation with a co-worker. (Car. Dep. 89–90, ECF No. 34.) Carr further stated that, based on employment records, all of the twelve incidents occurred between 1971 and 1998. (*Id.* at 90–91.)

### 2. The CBA, Conduct in the Workplace Policy, and Plant Rules

The terms and conditions of Lemaster's employment were governed by a collective

---

[4] The relevant collective bargaining agreement ("CBA") was filed as Joint Exhibit 1 to the Arbitration Transcript.

bargaining agreement ("CBA") between Anchor and the USW. (*See generally* CBA.) The CBA

contained a Management Rights and Responsibility provision that provided in part:

> [T]he Management of the plant and the direction of the working force are the responsibility of Management, including but not limited to, the establishment of work schedules, starting and quitting times; . . . the right to hire, promote, layoff, and to discipline and discharge employees for proper cause; and the right to formulate, revise, and implement plant rules and regulations . . . publish and issue booklets containing same, and require employees to observe and obey such rules and regulations.

(CBA Art. 6 Sec. 1.) The CBA further stated that Anchor could not exercise such duties "in an

arbitrary or unreasonable manner . . . ." (CBA Art. 6 Sec. 2.)

Under the CBA, the parties were subject to a grievance and arbitration procedure. (CBA

Art. 8.) The procedure required an employee to initiate the grievance process within five days of

the relevant occurrence. (CBA Art. 8 Sec. 3.) The procedure then followed a three step process,

beginning with a first-step meeting between the employee, the employee's supervisor, and the

Department Manager. (*Id.*) At step two, USW could file a written grievance and a second

meeting, adding the Grievance Committee Person and the Department Superintendent, woudl

take place. (*Id.*) Finally, the grievance procedure contained a step-three appeal, in which the

matter is reviewed by a committee that includes both Anchor and USW representatives. (*Id.*)

When Anchor terminated an employee, the CBA provided that "[g]rievances from terminations

[were] entered directly at Step 3 of the grievance procedure . . . ." (*Id.*)

If the parties were unable to resolve the grievance at step three, USW could appeal the

grievance to arbitration. Under the terms of the CBA, "[t]he decision of the arbitrator must be

given in writing within twenty (20) calendar days of the completion of the hearing and must be

complied with within five (5) days after it is announced." (*Id.*)

4

During the period of Lemaster's employment, Anchor maintained a Conduct in the Workplace Policy ("CWP"). (Arb. J. Ex. 2, ECF No. 37-1.) Carr testified that Anchor had not revised the CWP since it implemented the CWP in 1990. (Arb. Tr. 47, ECF No. 37.) The CWP prohibited a variety of conduct including threats, violence, intimidation, and verbal abuse. (Arb. J. Ex. 2.) The CWP stated:

> The Company may take disciplinary action against employees whose conduct violates this or other Company policies and practices. Depending upon the severity of the violation, disciplinary action could include termination for the first offense. Any retaliation against an associate who reports a policy violation will not be tolerated. Such action could result in termination of employment.

(*Id.*)

Anchor also maintained "Plant Rules" during the relevant period. Prior to February 2009, the Plant Rules divided offenses into three classes. (Carr Dep. 84.) Class I consisted of major offenses that were cause for immediate discharge. (*Id.* at 84–85.) Class II offenses were cause for suspension and could lead to discharge. (*Id.* at 85.) Finally, for more minor Class III offenses, an employee received a written warning upon the first offense, three days suspension upon a second offense, one week suspension for a third offense, and discharge upon the fourth offense.[5] (*Id.* at 86.) Prior to February 2009, the Plant Rules did not expressly state what offense class a knowing violation of the CWP would fall under. (*See id.* at 85–88.) Class III offenses, however, included "[t]hreatening, intimidating, coercing or interfering with fellow employees on company property." (*Id.* at 86.)

Carr stated that, in January 2008, Anchor management began considering changes to the

---

[5] Carr testified that, under the pre-February 2009 Plant Rules, Anchor would have consider Lemaster a first-time offender because he did not have any prior offenses within the preceding two years. (Carr Dep. 86–87.)

5

Plant Rules. (Arb. Tr. 48.) Ultimately, a revised version of the Plant Rules became effective on February 1, 2009. (*Id.*) The revised Plant Rules switched from a three-tier offense system to a two-tier system. (*Id.* at 50–51.) Specifically, the Plant Rules classified lessor offense, subject to progressive discipline, and major offenses, which allowed for suspension pending termination upon a first offense. (Carr Dep. 12.) The revised Plant Rules classified violation of the CWP as a major offense. (Arb. Tr. 51.)

### 3. Lemaster's Complaints and Carr's Investigation

In mid to late 2007, Lemaster testified that he began making complaints to his union representatives, White and Dennis Harvey ("Harvey"), regarding Sims. (Pl. Dep. 34.) Lemaster believed that Sims was performing the duties of a supervisor, under the terms of the CBA, such as selecting lead persons and inputting employees' work time. (*Id.* at 32–34.) Lemaster further complained that Sims was threatening, harassing, and screaming at people. (*Id.* at 29, 37–38.) According to Lemaster, in response to the complaints, White told him that "[w]e keep our problems in-house." (*Id.* at 35.) Lemaster stated that White would sometimes talk to Sims regarding the issues Lemaster raised, but Lemaster was unaware of White taking any further action. (*Id.* at 36.) Lesmaster asserted that Harvey would also speak with Sims, and that the problems would sometimes " stop for a little while and then [] would resume." (*Id.* at 37.)

Lemaster testified that, between late 2008 and early 2009, he complained to Norris regarding Sims. (Pl. Dep. 43.) This resulted in a meeting between Lemaster, Sims, and Norris. (*Id.*) According to Lemaster, Sims apologized for yelling at people and the meeting ended. (*Id.* at 44.) In September 2009, Lemaster testified that he filed a complaint with Carr regarding Sims' behavior and supervisory activities. (*Id.* at 45, 58–59.) According to Lemaster, Carr told him

6

she would look into the matter. (*Id.* at 59.) Carr stated that following Lemaster's complaint she spoke with Norris regarding the Department's payroll. (Carr Dep. 32.) Lemaster stated that he then had a subsequent meeting with Norris and union representatives (including White). (Pl. Dep. 47–48.) Lemaster reported that Norris became angry at the meeting and said that Sims was only doing what Norris told him to do. (*Id.* at 47–48, 54.)

Carr testified that Lemaster eventually made another complaint to her, stating that Sims—rather than Norris—was making decisions for the Department. (Arb. Tr. 62.) After this complaint, Carr stated that she spoke with Norris and Sims. (*Id.* at 63.) Carr stated that both Norris and Sims reported that Sims was acting under Norris' direction. (*Id.*) According to Carr, Sims also informed her that Lemaster was harassing employees within the Job Change Department. (*Id.*; Carr Dep. at 33.) Carr testified that, prior to this time, she had never received complaints about Lemaster engaging in intimidating or threatening behavior. (Carr Dep. 33–34.)

Following her meeting with Norris and Sims, Carr met with employees within the Job Change Department to investigate two issues. (*See* Arb. Tr. 64.) Carr specifically posed two questions to each employee (1) "[h]ave you witnessed inequities or inconsistencies with pay practice, vacation, scheduling, seniority, or overtime within the Job Change Department" and (2) "[h]ave you witnessed or experienced intimidation or harassment within your Job Change Department." (Arb. Tr. 69–70; Arb. Anchor Exs. 2–6, ECF No. 37-2.) Carr testified that she would write down the employees' responses, read back the statements to the employees, and then ask whether there were any corrections. (Arb. Tr. 70–71.) Carr typed out the answers and had the employees review and sign the statements. (*Id.* at 71–72.) White was present, as a witness,

7

at these interviews.[6]  (*Id.* at 71; Arb. Anchor Ex. 2–6.)

In response to the second question, five Department employees—White, Tigner, Curt Morris ("Morris"), Don Fisher ("Fisher"), and Shawn Stevens ("Stevens")—signed statements indicating that Lemaster had engaged in threatening, intimidating, or otherwise confrontational behavior.[7]  (*See* Arb. Anchor Exs. 2–6.)  For example, White's statement reflected that Lemaster would "explode[]" when things did not go his way.  (Arb. Anchor Ex. 2.)  Morris' statement indicated that Lemaster "argu[ed] and pick[ed] a fight every day with somebody."  (Arb. Anchor Ex. 3.)  Within his statement, Fisher reported that Lemaster intimidated him and that Lemaster had "temper tantrums . . . ."  (Arb. Anchor Ex. 4.)  Stevens also stated that Lemaster's actions intimidated him.  (Arb. Anchor Ex. 5.)  Tigner's statement discussed Lemaster's behavior and stated that he "raises Hell with everyone."  (Arb. Anchor Ex. 6.)  Tigner later testified, however, that his written statement was not an accurate reflection of what he told Carr.[8]  (Tigner Dep. 17, ECF No. 42-1.)  Tigner averred that Carr put the statement in "her own words, not my words." (*Id.* at 20.)

The statements of other Department employees indicated that they had never been threatened or intimidated.  (*See, e.g.*, Carr Dep. 53–56; Arb. Tr. 117–18.)  Finally, one employee's statement, Larry Eyman, mentioned Sims' behavior in response to the second

---

[6] Although White also signed the witness statements, he testified that he was not witnessing to the veracity of the written statement itself.  (White Dep. 40.)

[7] Carr testified that, despite Plant Rules requiring reporting of such conduct, none of the incidents the employees alleged within the statements were complained of at the time of the alleged conduct.  (Carr Dep. 48–49.)

[8] Tigner stated that he did not read or review his statement before signing it.  (Tigner Dep. 19.)

question. (Arb. Tr. 116.)

### 4. Termination and Arbitration Hearing

Carr testified that in light of the reports from the five employees regarding Lemaster, Anchor decided to suspend him pending discharge. (Arb. Tr. 87.) Anchor ultimately suspended Lemaster pending discharge on October 5, 2009. (Lemaster Dep. Ex. C, ECF No. 33-1.) On October 8, 2009, Anchor held a termination hearing. (Arb. Tr. 91.) In addition to Lemaster, union representatives White, Steve Six, and Dave Anderson were present. (*Id.*) According to Lemaster, he met with his union representatives for about five minutes before the meeting. (Pl. Dep. 68.) Lemaster stated that he attempted to give his side of events, but that Carr kept cutting off his statements. (*Id.* at 69.) Eventually, a third-step grievance meeting was held, at which White, Gary Lucas ("Lucas") (the staff representative for USW), and other union officials were present. (Arb. Tr. 92–94.) According to Carr, Lucas was Lemaster's primary spokesperson at the meeting. (*Id.* at 93.) Following this meeting, Anchor upheld Lemaster's termination. (*Id.* at 91, 94.) On November 6, 2009, following the third-step meeting, David Bender, Anchor's Vice President of Human Resources, sent Lucas a letter confirming that Anchor still found Lemaster's actions sufficiently severe to warrant termination. (Arb. Jt. Ex. 7, ECF No. 37-1.)

On November 11, 2009, White, as the Grievance Committee Person, filed a grievance form on behalf of Lemaster. (Arb. Jt. Ex. 6, ECF No. 37-1.) The grievance stated:

A.      Nature of grievance and facts upon which it is based:

> [USW is] filing this grievance on behalf of [] Lemaster. We feel [Lemaster] was terminated for unjust cause. We feel the company should have given [Lemaster] a chance to arrange for some type of a course in [an] anger management class. Again we feel [Lemaster's] termination is a very harsh punishment.

B.     Remedy or correction required:

[USW] hopes and prays you will give [Lemaster] a chance to turn his life and job around.

(*Id.*)  According to Lemaster, Lucas was furious over the language White used in the grievance. (Pl. Dep. 77–78.)  Lucas averred that he later amended the grievance to include a full back-pay demand.  (Lucas Decl. ¶ 4, ECF No. 31-9.)

Lemaster's termination was ultimately subject to an arbitration hearing.  Lucas represented Lemaster at the hearing.  Lemaster testified that Lucas' strategy was (1) to show that Lemaster did not know the relevant rules and that Anchor did not give Lucas proper notice of the rules and (2) to call witnesses to testify that Lemaster did not engage in the type of behavior in question.  (Pl. Dep. 83–84.)  According to Lemaster, he did not agree with Lucas' strategy because he knew the rules of harassment.  (*Id.* at 85.)  Lemaster also wanted to call Dennis Harvey, a prior union chairman, as well as  Eyman to testify.  (*Id.* at 85–86.)  Lemaster stated that White was present during most of the preparation meetings regarding his discharge, grievance, and arbitration.  (*Id.* at 101.)

The arbitration hearing took place on April 29, 2010.  Morris, Fisher, Stevens, and White all testified regarding their allegations against Lemaster.  (*See generally* Arb. Tr. 131–89.)  All of the witnesses appeared pursuant to subpoenas from the Arbitrator.  (*Id.* at 131, 154, 168–69, 181.)  Tigner did not testify at the hearing.  (*See* Tigner Dep. 20.)  Anchor, however, submitted Tigner's written statement at the hearing over Lucas' objection.  (Arb. Tr. 74–80.)  Five witnesses—including Lemaster and Curtis Antil ("Antil")—testified on Lemaster's behalf at the hearing.  Antil specifically testified that he had never had any significant problems with

10

Lemaster. (Arb. Tr. 236–37.)  Antil also testified that, in addition to the two general questions

detailed above, Carr asked him about other witnesses' statements regarding Lemaster's

intimidation.  (*Id.* at 235.)

### 5.    Arbitration Decision and Subsequent Action

Both Anchor and USW waived their CBA right to an arbitration decision within twenty

days at the April 2010 hearing. (Arb. Tr. 37–38.)  The USW submitted post-hearing briefs in

June 2010. (Lucas Decl. ¶ 7.)  Despite the parties communications with the Arbitrator inquiring

as to the status of a decision, the arbitrator did not reach an ultimate decision until February

2011. (*See* Lucas Decl. ¶¶ 7–12.)

On February 10, 2011, the Arbitrator issued a decision addressing whether Anchor lacked

just and/or proper cause for Lemaster's termination. (*See generally* Arb. Dec., ECF No. 38-3.)

Lemaster's grievance was sustained in part and denied in part. (*Id.*)  The decision recited the

grievance that White initially filed. (*Id.* at 2.)  The decision also acknowledged, however, that

Lemaster was requesting back pay. (*Id.* at 19.)  After a review of the CBA and the record

evidence, the Arbitrator found that Lemaster knew or should have known of the revised Plant

Rules and that the evidence suggested that Lemaster had engaged in conduct that the Plant Rules

and CWP prohibited. (*Id.* at 21–23.)  The Arbitrator further concluded that the record evidence

did not demonstrate retaliation against Lemaster for his complaints about Sims. (*Id.* at 25.)  At

the same time, however, the Arbitrator found that some evidence indicated that Lemaster's

behavior was commonplace within the Job Change Department. (Arb. Dec. 24.)

In light of these circumstances, the Arbitrator directed that Anchor reinstate Lemaster, but

transfer him out of the Job Change Department to another position based on his seniority. (*Id.* at

11

26.)  The Arbitrator required Lemaster to attend an anger management course as a condition of reinstatement.  (*Id.*)  If Lemaster chose to forego this reinstatement option, the Arbitrator stated that Anchor must afford Lemaster the opportunity to resign.  (*Id.* at 27.)  Finally, the Arbitrator directed that Lemaster should not lose seniority, but denied Lemaster's request for back pay. (*Id.*)

Following the decision, Lemaster received letters offering him a "selector/packer" position at a lower rate of pay than his previous position.  (Carr Dep. 66, 68; Pl. Dep. 96–97.) Lemaster failed to respond or communicate with Anchor concerning their reinstatement offer. (Pl. Dep. 97–98.)

**B.** **Procedural History**

Lemaster filed this action in June 2011.  Within his Complaint, Lemaster maintains that USW breached its duty of fair representation and that both Defendants breached the CBA. Additionally, Lemaster brings claims for civil conspiracy and intentional infliction of emotional distress against Defendants.  On August 6, 2012, pursuant to a motion to dismiss, the Court dismissed Lemaster's state law claims against Anchor.  The Court held that both Plaintiff's civil conspiracy and emotional distress claims would require the Court to examine the CBA and were, therefore, preempted under the LMRA.

This matter is now before the Court for consideration of Defendants' Motions for Summary Judgment.  Both Anchor and USW contend that they are entitled to judgment as to all of Lemaster's remaining claims.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

13

### III. ANALYSIS

**A.      Hybrid Action**

      **1.      Applicable Law**

For the purposes of his federal claims, Plaintiff is proceeding against his union and

employer through a hybrid theory alleging both breach of the duty of fair representation and

breach of the relevant CBA.  The United States Court of Appeals for the Sixth Circuit has

described such an approach as follows:

> Out of [Supreme Court precedent] grew the present litigation form, combining claims
> against the employer and the union into one hybrid case.  The suit against the
> employer alleges a breach of the collective bargaining agreement under § 301 of the
> LMRA.  The suit against the union alleges breach of the union's duty of fair
> representation, implied under the scheme of the [NLRA]. 29 U.S.C. § 158;
> *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 76
> L.Ed.2d 476 (1983). The two claims, however, are inextricably interdependent: "To
> prevail against either the company or the Union, [the employee] must not only show
> that [his] discharge was contrary to the contract but must also carry the burden of
> demonstrating breach of duty by the Union." [*Hines v. Anchor Motor Freight, Inc.*,
> 424 U.S. 554, 570–71 (1976)]; *see also DelCostello*, 462 U.S. at 164–65[]. The
> employee must prove both claims to recover from either defendant. *See DelCostello*,
> 462 U.S. at 165[]; [*White v. Detroit Edison Co.*, 472 F.3d 420, 425 (6th Cir. 2006)];
> *Driver v. USPS, Inc.*, 328 F.3d 863, 868 (6th Cir. 2003).

*Chapman v. United Auto Workers Local 1005*, 670 F.3d 677, 682 (6th Cir. 2012).

"A breach of the duty of fair representation occurs only when a union's conduct toward a

member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Merritt v.*

*Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (citing *Vaca*

*v. Spies*, 386 U.S. 171, 190 (1967)).  "A union's actions breach the duty of fair representation

under the arbitrary prong if the union's conduct can fairly be characterized as so far outside a

wide range of reasonableness that it is wholly irrational."  *Id.*  Under this standard, "a union may

14

not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." *White*, 472 F.3d at 426 (quoting *Vaca*, 386 U.S. at 190–91). Moreover, to prove that a union's conduct was discriminatory "carries with it the need to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Merritt*, 613 F.3d at 619 (internal quotations omitted). Finally, "[a] union acts in bad faith when it acts with an improper intent, purpose, or motive ... encompass[ing] fraud, dishonesty, and other intentionally misleading conduct." *Id.* (internal quotations omitted).

Importantly, the above standards reflect a "highly deferential examination of a union's performance . . . ." *Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386, 392 (6th Cir. 2012). "There is no requirement . . . that the grievance process be error-free." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (internal quotations omitted). "Mere negligence on the part of a union does not satisfy this requirement." *Id.* "[O]rdinary mistakes, errors, or flaws in judgment also will not suffice." *Id.* Moreover, "[w]hen reviewing a union representative's actions or omissions, we must never lose sight of the fact that union agents are not lawyers, and as a general proposition, cannot be held to the same standard as that of licensed professionals." *Id.*

Finally, "[i]f an employee demonstrates that the union acted contrary to its legal duty, the employee must then show that the union's actions or omissions tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach."[9] *Danton v.*

---

[9] Along similar lines, some Sixth Circuit case law has held that "[i]n the context of a hybrid 301 action, absent a finding that an erroneous arbitral decision has been reached, the inquiry into the union's failure to comply with its duty of fair representation becomes immaterial, and is not justiciable." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555. 560 (6th Cir. 1990).

*Brighton Hosp.*, 335 F. App'x 580, 585 (6th Cir. 2009) (internal quotations omitted); *see also Hayes v. UPS*, 327 F. App'x 579, 584 (6th Cir. 2009) ("Where the union actually utilizes the grievance and arbitration procedures on behalf of he employee, the focus is . . . on whether . . . there is substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the contractual proceedings.") (quoting *Hines*, 424 U.S. at 568.). In other terms, the plaintiff bears the burden of demonstrating "that the grievance process was *seriously flawed* by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct." *Id.* (internal quotations omitted).

## 2.    Discussion

In this case, Lemaster maintains that the USW breached its duty of fair representation through arbitrary and bad faith action.[10] Lemaster specifically sets forth four contentions. First, Lemaster contends that the USW—and specifically White—submitted an improper grievance on his behalf. Second, and relatedly, Lemaster contends that White's participation in the process was inapproriate because he had a conflict of interest given his allegations against Lemaster. Third, Lemaster faults the USW for its arbitration strategy and failure to present certain evidence and witnesses. Finally, Lemaster maintains that the USW failed to compel a timely decision form the arbitrator.

Based on the current record, and construing the evidence in Lemaster's favor, Defendants are entitled to judgment as a matter of law. Specifically, from the evidence before the Court, a trier of fact could not reasonably conclude that USW breached its duty of fair representation. For

---

[10] Lemaster does not focus on contentions of discriminatory action and there is no evidentiary support for an inference of discrimination.

the purposes of clarity, the Court will discuss Lemaster's various contentions sequentially. Nevertheless, considering the circumstances in combination, there is still insufficient evidence that USW's actions were arbitrary, discriminatory, or taken in bad faith.

First, any defect in the initial grievance did not to amount to a breach of the duty of fair representation. As detailed above, following the third-step grievance proceeding, White filed a grievance stating that USW believed Lemaster was terminated without just cause; that Anchor should allow Lemaster an opportunity to attend an anger management class; and that USW "hope[d] and pray[ed]" that Anchor would give Lemaster "a chance to turn his life and job around." (Arb. Jt. Ex. 6.) Lemaster contends that the language of the grievance amounted to an admission of the allegations against him. Although the grievance's phrasing was perhaps not optimal, the initial grievance was not unreasonable. Rather, the grievance contains both a substantive challenge to Anchor's cause for termination as well as an assertion that the punishment was unduly harsh. Tellingly, despite Lemaster's contentions that the grievance was an admission, the record makes clear that the underlying allegations of misconduct were disputed during arbitration proceedings. For example, the Arbitrator's decision recognized that USW challenged whether Anchor met its burden of showing that Lemaster was guilty of a conduct violation. (Arb. Dec. 17.)

With regard to the initial grievance, Lemaster also asserts that White failed to consult with him before filing the grievance. (*See* White Dep. 49.) The Court finds this assertion insufficient to establish breach. As a general matter, unions are afforded considerable discretion in prosecuting grievances. *Eggers v. Moore*, 257 F. App'x 993. 995 (6th Cir. 2007). Regardless, the evidence does not establish that any failure to communicate on the part of White prejudiced

17

Lemaster. *See Williams v. United Steelworkers of Am.*, No. 1:09–CV–743, 2011 WL 2135179, at *7 (S.D. Ohio May 27, 2011) ("A delay or failure in communication does not amount to a breach of the duty of fair representation . . . in the absence of prejudice caused thereby."). Specifically, the evidence indicates that Lucas filed an amended grievance, explicitly requesting back pay. Although the Arbitrator recited the initial grievance within his decision, he also expressly considered the request for back pay. Moreover, the evidence does not provide any suggestion that Lemaster would have received a more favorable determination but for the initial grievance. Rather, the Arbitrator ultimately found Anchor's evidence—and in particular Lemaster's co-workers' testimony—compelling in establishing workplace policy violations. (*See* Arb. Dec. 23–24.) If anything, the initial grievance appears to have benefitted Lemaster, as the Arbitrator ultimately agreed that, despite such violations, the ultimate punishment was overly harsh and conditional reinstatement was appropriate.

Second, Lemaster fails to establish a material dispute of fact as to breach of fair representation based on White's involvement in grievance proceedings. It is undisputed that White provided testimony—during the initial investigation and under subpoena at the arbitration hearing—adverse to Lemaster's interests. Despite this testimony White also acted, to some extent, as one of Lemaster's union representatives during the termination proceedings. Given the interrelationship between unions, union representatives, and union employees, some level of conflict may at times exist.[11] *Cf. Marshall v. Ormet Corp.*, 736 F. Supp. 1462, 1471 (S.D. Ohio 1990) (" [A] union must and can, without violating anyone's rights, represent employees with

---

[11] This is not to say that a conflict of interest will never result in a finding of bad faith and/or arbitrary action. In this case, however, White's representative role in the grievance proceedings was not significant enough to amount to breach.

conflicting interests."). The question becomes whether White's conduct, and any conflict of interest on his part, allows for a reasonable inference that USW acted arbitrarily or in bad faith when representing Lemaster.

The Court finds that it does not. Here, White's representation of Lemaster in grievance and arbitration process was relatively minimal and the evidence does not indicate that it negatively impacted the outcome of proceedings. It is undisputed that White was the Grievance Committee Person, and was, therefore, responsible for writing up grievances. (*See* Pl. Dep. 48.) While it might have been ideal for USW to have relieved White of this duty under the circumstances, for the reasons detailed above, the initial grievance did not negatively affect the outcome of the grievance and arbitration proceedings. Furthermore, the evidence indicates that as early as the third-step meeting, and certainly by the time of arbitration, Lucas was Lemaster's primary union representative. Lemaster speculates that, based on White's presence at some of the planning meetings, White was divulging strategies to Anchor. Without further evidence, however, the Court finds no reasonable grounds for such an inference. Finally, Lemaster maintains that, based on White's role as a witness during the initial investigation, White knew that Tigner's written statement was inaccurate. According to Lemaster, White should have taken action to prevent Anchor's submission of Tigner's written statement. The arbitration transcript indicates, however, that USW—through Lucas—did object to the admission of Tigner's statement at arbitration.[12] (*See* Arb. Tr. 73–83.)

---

[12] Notably, the Arbitrator's decision indicates that he relied heavily on the arbitration testimony of the subpoenaed witnesses (as opposed to Tigner's statement) in determining that Lemaster had violated workplace rules, as he found the testimony to be candid and forthright. (Arb. Dec. 23–24.)

Third, a reasonable trier of fact could not conclude that USW's arbitration strategy amounted to a breach of fair representation. As detailed above, Lemaster's testimony reflects that Lucas developed a two-prong strategy for the arbitration (1) maintaining that Lemaster did not understand, and was not sufficiently notified of, the relevant harassment rules, and (2) that Lemaster had not engaged in the kind of behavior at issue. (Pl. Dep. 83–84.) Lucas called five witnesses to testify at the arbitration, including Lemaster. Given Lemaster's testimony that he knew the rules of harassment, the first prong of this strategy might have been unwise. At the same time, the strategy was not wholly unreasonable. Some of the arbitration evidence, including Lemaster's testimony, suggested that Anchor did not effectively distribute the CWP and revised Plant Rules to its employees. (*See, e.g.*, Arb. Tr. 242–43, 268.) Regardless, USW presented evidence, including the testimony of Lemaster and Antil, that Lemaster did not engage in harassing behavior.[13] (*See* Arb. Tr. 236–37, 275.) Although Lemaster maintains that other witnesses should have been called and other evidence presented,[14] it is not the Court's role to second guess—with the benefit of hindsight—USW's tactical decisions. Construing the evidence in his favor, Lemaster has not met the onerous burden of demonstrating that USW's conduct in preparing and executing an arbitration strategy was either arbitrary or in bad faith.

Finally, Lemaster maintains that USW breached its duty of fair representation by failing

---

[13] Lemaster and Antil also each offered testimony regarding Sims' conduct. (*See* Arb. Tr. 238, 271–72.)

[14] For example, Lemaster contends that USW should have submitted an unsworn letter, purportedly written by Antil, during the arbitration hearing. (*See* Lemaster Dep. Ex. I, ECF No. 33-2.) Antil stated within the letter that Carr had attempted to get him to change his investigation answers and that Sims had also spoke with him about making a statement against Lemaster. (*Id.*) Nevertheless, although USW did not attempt to introduce the letter, Lucas did call Antil and he ultimately testified regarding Carr's questions. (Arb. Tr. 235.)

to compel a timely arbitration decision.  It is uncontested that USW waived its CBA right to an arbitration decision within twenty days of the April 29, 2010 hearing.  Given Luca's desire to review the hearing transcript and submit post-hearing briefing, this waiver was not unreasonable.  (*See* Lucas Decl. ¶ 7.)  Unfortunately, despite inquiries from both Anchor and USW, the Arbitrator was not able to reach a decision until February 10, 2011.  (*See id.* at ¶¶ 7–12.)  Under these circumstances, however, USW cannot be reasonably faulted for this delay.  Moreover, Lemaster fails to demonstrate, in any manner, that this delay affected the outcome of the arbitration proceedings.

Ultimately, the evidence does not allow for a reasonable inference that USW's actions were arbitrary, discriminatory, or in bad faith.  Because the Court finds that Lemaster fails on the breach of fair representation component, it is unnecessary to consider whether Anchor breached the CBA.  *See Hayes*, 327 F. App'x at 586–87 (holding that the district court was not require to address breach of the CBA when the plaintiff failed to establish a breach of the duty of fair representation).  Given the inextricably interdependent nature of a hybrid action, both USW and Anchor are entitled to judgment.

**B.**     **State Law Claims**

In addition to its hybrid action, Lemaster attempts to bring independent state-law claims against Defendants for civil conspiracy and intentional infliction of emotional distress ("IIED").  As detailed above, on August 6, 2012, the Court dismissed such claims as to Anchor based on preemption under § 301 of the LMRA.  USW now contends that the same preemption analysis

21

requires dismissal of the civil conspiracy and IIED claims against them.[15] Lemaster fails to submit any response concerning preemption.

### 1. Civil Conspiracy

As the Court outlined within its August 6, 2012 Opinion and Order:

> Section 301 of the LMRA preempts state law claims whose resolution requires an interpretation of the terms of a collective bargaining agreement. 29 U.S.C. § 185(a). Section 301 provides that:
>
>> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
>
> 29 U.S.C. § 185(a); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220–21 (1984) (holding that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law."); *Mattis v. Massman*, 355 F.3d 902, 905 (6th Cir. 2004) ("[T]he Supreme Court 'has made clear that § 301 of the LMRA preempts any state-law claim arising from a breach of a collective bargaining agreement.'" (quoting *Smolark v. Chrysler Corp.*, 879 F.2d 1326, 1329 (6th Cir. 1989) (en banc))).
>
> The Sixth Circuit has adopted a two-step inquiry to determine whether a state law claim is sufficiently independent to survive § 301 preemption. *Mattis*, 355 F.3d at 906. First, the Court must determine whether resolving the state law claim would require interpretation of the terms of the collective bargaining agreement. *Id.* If so, the claim is preempted. If not, then the Court must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. *Id.* If the rights were created by the collective bargaining agreement, the claim is preempted. *Id.* In short, if a state law claim fails either of these two requirements, it is preempted by § 301.

---

[15] The Court, in theory, could simply decline to exercise supplemental jurisdiction over any potentially independent state law claim. Nevertheless, there is a clear federal interest in this general area and, under the circumstances of this case, it would be inefficient to leave the question of preemption unresolved. Accordingly, the Court will address USW's contention of preemption.

(Opinion & Order 6–7, ECF No. 25.)

With regard to Lemaster's civil conspiracy claim, the same preemption analysis outlined in the Court's April 6, 2012 Opinion and Order applies. Lemaster alleges that Anchor and USW shared a common purpose to unlawfully terminate him. Any determination of whether Lemaster's termination was unlawful, however, would require the Court to interpret the CBA, as the CBA set forth Lemaster's legal rights with respect to termination. Accordingly, § 301 preempts Lemaster's remaining civil conspiracy claim.

### 2.  Intentional Infliction of Emotional Distress

Lemaster's IIED claim requires a different, albeit similar, preemption analysis. Lemaster's pleadings and briefing reflect that its IIED claim against USW is based on USW's conduct in representing him during termination proceedings.

As the Sixth Circuit has recognized, "[t]he duty of fair representation relates to an area of labor law which has been so fully occupied by Congress as to foreclose state regulation." *Bickers v. Int'l Assoc. of Machinists & Aerospace Workers*, 8 F. App'x 514, 516 (6th Cir. 2001). Within the context of a state-law IIED claim involving union activity, the Supreme Court has recognized that the NLRA will not always preempt such claims. *Farmer v. United Bhd. of Carpenters*, 430 U.S. 290, 304 (1977) (recognizing that California had a substantial interest in protecting citizens from outrageous conduct). At the same time, the Supreme Court recognized that IIED claims "cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme." *Id.* at 305. Therefore, "it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the

23

discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself." *Id.*; *see also Callender v. Wilberforce Univ.*, No. 3:07-cv-208, 2007 WL 4287663, at *3 (S.D. Ohio Dec. 4, 2007) ("[A]n IIED claim will survive preemption if it is either (1) unrelated to the underlying employment dispute; or (2) a function of the particularly abusive manner in which the conduct alleged in the underlying dispute is accomplished or threatened.") (internal quotations omitted).  In other terms, "[t]he conduct of the underlying labor dispute 'cannot itself form the underlying outrageous conduct on which the state-court tort action is based; to hold otherwise would undermine the preemption doctrine.'" *Callender*, 2007 WL 4287663, at *4 (quoting *Farmer*, 430 U.S. at 305.).

In this case, federal labor law preempts Lemaster's IIED claim against USW.  The purportedly "outrageous conduct" Lemaster complains of is how USW represented him during termination proceedings.  The claim is not based on conduct unrelated to the underlying employment dispute.  Nor does the case involve a particularly abusive manner of conduct, as was the case in *Farmer,* such that the Court can view the rights at stake as independent of Lemaster's federal labor claims.  Instead, "the alleged tortuous acts by the Union all relate to their duty to represent plaintiff fairly under the collective bargaining agreement." *Calendar*, 2007 WL 4287663, at *4 (internal quotations omitted).  Under these circumstances, preemption is proper and Lemaster fails to set forth an independent IIED claim.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are **GRANTED**. (ECF No. 31, 38.)  The Clerk is **DIRECTED** to remove this action from the Court's pending case list.

**IT IS SO ORDERED.**

_7-1-2013_
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**